Evans *v.* Fisher.

---

ROBERT K. EVANS, by Guardian, *v.* E. S. FISHER, Executor.

1. ESTATES OF DECEDENTS: REAL ESTATE: CHARGEABLE WITH DEBTS AT COMMON LAW AND BY STATUTE.—At common law, real estate of freehold, of which a person died seized, descended to the heirs, and was chargeable only with debts due by specialty, in which the ancestor bound himself and heirs. The rule has been changed by statute, and in England and the United States the real estate of the deceased is chargeable with his debts over and above what the personal estate may be sufficient to pay. *Lee* v. *Gardner*, 26 Miss. R. 541, 542; Rev. Code, 443, article 85; page 455, articles 88, 89; page 448, article 98.

2. SAME: DECLARATION OF INSOLVENCY UPON INSUFFICIENCY OF PERSONALTY: TO WHAT TIME DOES INSUFFICIENCY RELATE.—The statute, Rev. Code, 445, articles 88, 89, which provides that, when executors or administrators shall discover that the personal estate will not be sufficient to pay the debts of the estate, they may petition the Probate Court for a sale of the land, does not contemplate insufficiency of personalty alone at the time of the death of the decedent, but insufficiency occurring at any time during the course of the administration. Harris, J., dissenting.

3. SAME: SALE OF LAND FOR PAYMENT OF DEBTS WHEN PERSONALTY SUFFICIENT AT TIME OF DEATH OF DECEDENT.—If the personal property be sufficient at the time of the death of the decedent to pay the debts, and it afterwards turns out from any cause whatever, without fault on the part of the heir or creditor, to be insufficient, the creditors can resort, through the executor or administrator, and in the Probate Court, to the real estate for the purpose of paying the debts. Harris, J., dissenting.

4. SAME: DEFICIENCY OF ASSETS AS BETWEEN LEGATEES.—A legatee, who has been paid his legacy in full, will be compelled to refund to an unpaid legatee if there was an original deficiency of assets, but not if there was no such original deficiency, and there had been a waste by the executor. 2 Johns. Ch. R. 614, 627; 1 Vernon, 162; 1 Aust. 112.

5. SAME: DEFICIENCY OF ASSETS AS BETWEEN LEGATEE AND CREDITOR.—A satisfied legatee will, upon a deficiency of assets to pay debts, be compelled to refund in behalf of a creditor, although the testator's property, at the time of his death, was sufficient to pay both debts and legacies, and although the executor has misapplied or wasted the assets and become insolvent. 2 Wms. on Exrs. 1308; 2 Barb. S. C. R. 493; 1 La. Ann. 214; 1 Story's Eq. 92.

6. SAME: DEFICIENCY OF PERSONALTY AS BETWEEN HEIR AND CREDITOR, WHEN DEFICIENCY THE RESULT OF A DEVASTAVIT.—If the personal estate of an intestate become insufficient to pay debts in consequence of the devastavit or neglect of duty of the administrator, the lands cannot be sold for the purpose of paying debts until the creditors have exhausted all remedy against the administrator and securities.—*Turner* v. *Ellis*, 24 Miss. R. 173; 32 Miss. R. 320.

7. SAME: MARSHALLING ASSETS.—When a creditor enforces the payment of his debt out of the real estate of a decedent, and the estate subsequently receives compensation for personal property which has been destroyed, the heir will be entitled to be reimbursed out of the personal estate.

APPEAL from the Probate Court of Lafayette county. Hon. A. Peterson, judge.

The facts of the case will be found in the opinion of the court.

*W.* and *J. R. Yerger* for appellant.

By the common law, the real estate of a deceased person was not liable to answer his simple contract debts, no actions being maintainable against the heir in respect of descended assets, except by creditors, whose debts were constituted by an instrument under seal, that is a specialty obligation, and not even then, unless an intention to charge the heir of the debtor were distinctly indicated. 2 Jarman on Wills, 395.

This common law rule has been modified to some extent

by statute in this State. By article 80, chapter 60, Rev. Code, 443, it is declared, that "The goods, personal estate, choses in action, and money of the deceased, or which may have accrued to his estate from the sale of property, real or personal, or otherwise, whether he died testate or intestate, shall be assets, and shall stand chargeable with all the just debts and funeral expenses, of settling the estate; and the lands, tenements, and hereditaments of the testator or intestate, shall also stand chargeable for the debts over and above what the personal estate may be sufficient to pay, and may be subjected to the payment of debts in the manner hereinafter directed, saving to the widow her right of dower."

This statute being in derogation of the common law, and depriving the heir-at-law of rights which at common law belong to him, will not be extended beyond its terms. In construing the acts of 1839, and 1846, conferring rights upon married women to hold property separate from their husbands, this court says: " The separate estate in her slaves, secured to the wife (by this statute), was so much deducted from or carved out of the rights of the husband at common law. Upon the clearest principles, therefore, those rights of the husband are not to be considered as restricted or abrogated, unless by the express and positive language of the statute, or by necessary implication." *Knate* v. *Lyon,* 26 Miss. R. 548. To same effect see *Cameron* v. *Cameron,* 29 Miss. R. 120.

How far then and to what extent has the statute changed the common law in reference to the applications of realty to the payment of the debts of a decedent?

It is very clear from the language of the statute, and so this court has uniformly holden—and a similar rule has been held by the American courts generally—that lands on the death of the owner do not descend to the administrator, but to the heir. Thus in *Bullock* v. *Sneed,* 13 S. & M. 393, this court says: "An administrator has nothing to do, unless the estate be insolvent, with the realty of his intestate. Upon the death of the latter, it passes at once to his heirs. The rent of the land, unless the estate be insolvent, goes to the heirs." See also 4 Howard R. 31.

The same principle is recognized in many other cases, and will not be controverted by opposing counsel.

In the case of the *Bank of Hamilton* v. *Dudley's lessee*, 2 Peter's R. 523—same case, 8 Curtis' R. 195,—the Supreme Court of the United States, commenting upon the statutes of Ohio, which are very similar on this subject to our own, uses the following language: "The lands of an intestate descend not to the administrator, but to the heir. They vest in him, liable it is true to the debts of his ancestor, and subject to be sold for those debts. The administrator has no estate in the land, but a power to sell under the authority of the court."

Again, it has been laid down by an elementary writer of considerable research, that "it is a general rule of the English and American law, that the personal estate is to be first exhausted in the discharge of debts, even to the payment of debts, with which the real estate is charged by mortgage." J. Jarman on Wills, 391, and authorities cited in note.

And at the common law, even in cases where the ancestor has charged the realty with his debts, if at his decease there were originally a sufficiency of personal assets to discharge the debts, but which assets have been wasted, the realty will be exonerated, and the creditor will be compelled to resort to the administrator and his sureties for a devastavit in order to recover. 1 P. Wms. R. 495; 1 Vernon's R. 94. In *James* v. *Ellis*, 24 Miss. R. 173, this court says: "If the personal estate become insufficient to pay debts, in consequence of a devastavit or neglect of duty by the administrator, the heir-at-law can insist on this as a defense against the sale of the land descended. In such case the creditor's remedy would be by an action on the bond of the administrator; and the judgment of the Probate Court, in refusing a sale of the land, would be equivalent to deciding, that the personal estate was sufficient to pay the debts of the intestate, and had been wasted by the administrator."

In the American courts, where the lands are made liable to sale, under an order of the court, to pay debts, it does not follow that the order will be made at all events, because the debts are

unpaid. But courts generally will refuse license to an executor or administrator to sell real estate, unless the application is made therefor, within a reasonable time, after the expiration of limitation of suits against executors and administrators.

In *Paine* v. *Pendleton*, 32 Miss. R. (3 George R.) 323, this court says: "It appears by the record, on the hearing of the petition, that there were assets, largely exceeding the amount of the claims against the estate, on which the petition was founded, which had never been administered or accounted for, by the prior administrator. If those assets were wasted by the prior administrator, that would be no ground for selling the lands of the decedent, for the payment of his debts, unless the creditor had exhausted all remedy, in due legal form, against the administrator and his sureties. The remedy of the creditor would be against that administrator, and if the sureties on his bond were insolvent, as was attempted to be shown here, that would not of itself justify a sale of the lands, for the personal assets were sufficient to pay the debts; and if the Probate Court failed to require sufficient sureties to the administrator's bond, and in consequence thereof, the assets of the estate, which were sufficient to pay his debts, were collected and wasted by that administrator, there could be no reason or justice in charging the debts of the estate upon lands to which the heirs were entitled, or in which other persons or purchasers had become interested; all legal remedies against the administrator and his sureties not being shown to have been exhausted." See also, *Ester* v. *Johnson*, 10 Humphrey's R. 225.

It will thus be seen that in this State, as at the common law, the lands of a decedent upon his decease descend to his heir-at-law, and the administrator has no estate in them, nor any control over them, except the personal is insufficient to pay the debts. The only change which our statute has made in the common law is this: It charges the real estate in the hands of the heir with all the debts "over and above what the personal estate may be sufficient to pay;" while at the common law, the real estate in the hands of the heir was only chargeable with the *specialty* debts of the ancestor, "over and above what the per-

sonal estate was insufficient to pay." But in either case the lands descend directly to and become the property of the heir on the death of the ancestor. In each case the personal estate is the primary fund, out of which creditors are to be satisfied; and in neither case have they a right to touch the land if the ancestor left sufficient personal estate to pay the debts; and, as we have seen, if the personal assets were originally sufficient, but by a devastavit they have become insufficient, that is no reason for selling the land, or subjecting it in the hands of the heir to the payment of debts. When the statute says that the "lands shall stand chargeable for the debts over and above what the personal estate may be sufficient to pay," it clearly has reference to the sufficiency of the personal estate at the death of the ancestor. If sufficient *then* to pay his debts, there was no charge upon the land in the hands of the heir; because it was only chargeable over and above what the personal estate was sufficient to pay. Now, what are the facts as shown by this record? At the death of the ancestor his personal estate was much more than sufficient to pay his debts. That personal estate went into the hands of the administrator. While in his hands, and until the debts were paid, the heir had no control over it. It was the property of the administrator, and was assets in his hands to pay the debts. But by the casualties of war, by operation of law, by causes over which the heir-at-law had no control, and without any agency on his part, this fund has been taken out of the hands of the administrator, and he cannot now apply it to the payment of the debts. Here there are two innocent persons, the creditor and the heir-at-law; and the question arises, which shall bear the loss thus accruing? When his ancestor died, the heir took the land only chargeable with the debts "over and above what personal estate of his ancestor was sufficient to pay." But in this case, the personal estate of the ancestor was sufficient to pay all his debts. There was then no charge upon the land in the hands of the heir. But since the decease of the ancestor a change has been made in the constitution and laws of the State. The personal estate has been by law taken out of the hands of the administrator, and

if the land in the hands of the heir be now charged with all the debts, it will be chargeable not only "for the debts *over and above* what the personal estate was sufficient to pay," but also with those debts which the personal estate was sufficient to pay, but which cannot now be applied to the debts, in consequence of a statute forbidding it, or a destruction accruing from causes beyond the control of the heir-at-law. The creditor cannot rightfully throw this charge upon the heir-at-law. He has no right to complain as against the heir that the law has taken away the property intended to pay his debts. It is *damnum absque injuria*, for the act of God or the act of the law in legal contemplation injures no one. In this case, the loss must fall on the title. When the ancestor died, the creditor had no right to sell the land of the heir to pay these debts. If he had applied to do so, the application would have been refused, because there was sufficient personal property to pay the debts. That property has been taken away by operation of law or casualty of war. The heir had no agency in doing it, and could not prevent it. The loss thus sustained ought certainly to fall upon him to whose use the property had been appropriated.

The case of a levy upon personal property by a sheriff presents a striking analogy to the present.

A levy upon personal property, sufficient to pay an execution, is in law, *primâ facie*, a satisfaction. Having been taken out of the hands of the debtor, if it is wasted by the sheriff, or is taken out of his hands by force, or die before it is sold, the debtor cannot be called upon to make a second satisfaction. His property having been once taken, sufficient to pay the judgment, and lost or not appropriated from causes beyond his control, the law steps in and declares, that having once taken into its control sufficient property to pay the debt, it will not throw upon the debtor the loss of the property while in the custody of the law, where such loss has accrued from causes beyond the control of the debtor.

The debts of the ancestor are not a lien upon the land in the hands of the heir. He takes an absolute title, subject only to be defeated or charged with the debts of the intestate, upon

proper steps being taken for that purpose. 13 Barbour's R. 252; 3 Barbour's Ch. R. 186, 187; 20 Johns. R. 414.

Again, it may be remarked, as a general rule, that the law declares all the property of a debtor shall be devoted to the payment of his debts; that he cannot give away any portion of it, leaving his debts unpaid; in short, that all his property is chargeable with his debts, and will be appropriated by the law to the payment of them. But Judge Story says: "Suppose a party possessed of a large estate and indebted at the same time to a considerable amount, but his debts bearing a small proportion to his actual property, should make a settlement or other voluntary conveyance, in favor of his wife or children, of a part of his estate, which should still leave a large surplus in his own hands beyond the assets necessary to pay his debts, and afterwards, at a distance of time, he should lose or spend so much of his property as not to leave enough to pay his debts, the question would then arise whether, in regard to such creditors, the settlement or other conveyance would be void or not."

This question he evidently inclines to answer in the negative, and the cases cited by him leave no doubt that such conveyances are not void. 1 Story's Eq., sections 358 to 365, and the authorities there cited. Indeed this rule seems now fully established in the English and American courts, notwithstanding some *dicta* to the contrary, and such conveyances are now upheld.

If, then, the law will permit a debtor, having ample means to pay his debts, to give away to his wife or children a part of his estate, provided he leaves sufficient to pay his debts, and will uphold such a conveyance as to prior and existing creditors, although at a distance of time the debtor may have lost or spent his property, and thus become unable to pay his debts; with how much more propriety and force can the heir-at-law, after the death of the ancestor, insist and claim that the real estate, which the *law* has cast upon him, which he takes not by gift from the ancestor, but by the law and through its provisions, shall not be taken by the creditor to pay his debt when there was an ample fund provided to pay the debt, which would have extinguished it if it had been applied to that purpose at the

time, but which, at a distance of time has been lost or destroyed by causes beyond the control of the heir and without his agency.

Unless the rule contended for by us be sustained, and the liability of the heir be determined by the condition of the estate and the sufficiency of personal assets at the decease of the ancestor, or at least upon the appointment of the administrator and the return of the inventory, the heir is made the guarantor not only of the good faith and proper conduct of the administrator and of the solvency of his sureties, but also of the stability of the government, and the perpetuity and continuance of the constitution and laws. He is made to guarantee against war, revolution, and the confiscation of property by act of the government; and this not for a day or year, but for an indefinite and unlimited period, while the personal estate is in the custody of the law, in the hands of the administrator.

On the decease of a party, the policy of the government in reference to his estate made a division of his property. The personal estate it placed in the hands of his administrator to pay his debts. The real estate became the property of his heirs. It became their absolute property, with the right to alien and sell; and if the personal estate was sufficient to pay the debts, he took it without any charge. Those who seek to subject it in the present case, can only sustain their claim by showing that the heir took the lands, chargeable not only with the debts, which, when the descent was cast upon him, the personal estate was insufficient to pay, but also with those debts which it was then sufficient to pay, but the application of which to their payment the administrator cannot now make, because the law has interposed and declared that it shall not be so applied. It is, in short, an attempt to make the heir and his property bear the losses and burdens of war and revolution in order to exonerate the estate of the creditor. The case may be a hard one upon the creditor, but it would be equally hard upon the heir. He is equally innocent with the creditor. As the tree has fallen, so must it lie. In losing his debt by the destruction of the fund appropriated to its payment, the creditor occupies no worse position, sustains no greater loss, than the rest of this commu-

nity—all of whom have felt the desolation of war in its bitterness, and have seen their property, the accumulation of a life of toil, dissolve into nothingness, becoming less real than the baseless fabric of a dream.

E. S. Fisher, in the case of *Purnell* v. *Fox and Money*, the same questions being involved as in this case, for appellant contended,

This was a bill of review, filed in the Probate Court of Carroll county, to set aside a decree made at the September Term, 1866, of said court, on the application of the administrators of the estate of Henry M. Purnell, deceased, for the sale of the lands of the deceased for the purpose of paying debts. The only question for the decision of the court is, whether the loss, resulting from the emancipation of the slaves of the deceased, must fall upon the heirs-at-law or upon the creditors of the estate.

Upon the death of the intestate, his lands descended to his heirs, and the title immediately vested in them, subject to the condition, that the title might be divested if the personal estate, the title to which vested in the administrators, was insufficient for the payment of the debts.

The language of the law is, "and the lands, etc., of the intestate or testator shall also stand chargeable for the debts over and above what the personal estate may be sufficient to pay." Code, page 443, article 80.

Our first inquiry must be to ascertain the nature of the estate, which the heirs took by descent under this statute. All estates which are vested are either absolute or conditional. It has already been said, that upon the death of the intestate, his lands vested in his heirs; and the estate having vested, the question is, as to the condition which may defeat this vested estate. Estates upon condition are of two kinds—conditions precedent and conditions subsequent. In case of the former, the condition must be performed before the estate will become vested; and in case of the latter the condition must be broken before the estate can be divested. The heirs,

then, in this instance, took an estate upon a condition subsequent; in regard to which Chancellor Kent says: "Conditions subsequent are not favored in law, and are construed strictly, because they tend to destroy estates." And again he says: "If the condition subsequent be possible at the time of making it, and becomes afterwards impossible to be complied with, either by the act of *God or of the law,*" "the estate being once vested, is not thereby divested." 4 Kent, 134.

Now bear in mind that an application by an administrator to sell lands for the payment of debts is a proposition to divest an estate, and we have the rule which must govern the court.

In the first place, the statute subjecting lands to the payment of debts, is one in derogation of the common law, and must therefore be strictly construed; and second, that whatever tends to divest an estate must receive the same construction—the effort of the law being, if possible, to save the estate. The object of strict construction is to prevent a forfeiture of the estate; and hence, the state of facts which is to establish a breach of the condition must be strictly construed, because it is this breach which is to divest the estate, which it is the object and policy of the law to prevent if possible.

As it is the *insufficiency* of the personal estate to pay the debts which creates the condition which may defeat the title of the heirs, it becomes important to inquire at what point of time this *insufficient* of the personal estate must exist. After a grant of administration, the title of the administrator to the personal estate, like the title of the heirs to the lands, relates back to the death of the intestate; and the sufficiency or insufficiency of the assets, or, in the language of the Code, of the personal estate, must be fixed and determined by the amount and value of the property covered by the administrator's title. If, therefore, the administrator received beyond all question personal estate enough to pay the debts, it is immaterial what he did with it; if he failed to carry it through a due course of administration, the estate of the heirs in the land became immediately absolved from the condition, and the estate became absolute; and if the title of the heirs was for even a moment of time

relieved from this condition, it was relieved forever.    It was not in the power of the administrators, by a devastavit, to create a breach of the condition.    This doctrine was settled nearly two centuries ago in England, where it was held upon a bill to compel a legatee, who had received his legacy, to refund for the benefit of creditors, who, under the law, were entitled to be first satisfied, *that if the assets were "originally deficient,"* the legatee would have to refund; but if the deficiency arose from a devastavit by the executor, there being *originally enough* to pay both debts and legacies, the legatee having received only what he was entitled to, was not bound to refund.

So again where the residuary legatees received their legacies before the payment of special legacies, there appearing to have been assets enough received by the executor to pay both, the bill was dismissed on the ground that the remedy was against the executor, and that the residuary legatees were not bound to refund.    The court said the distinction is between the cases where there was "*originally a deficiency* of assets," and where the executor had wasted them.    1 Pere Williams, 494; 1 Vernon's Ch. R. 94.    The same doctrine was laid down by this court in the case of *Turner* v. *Ellis,* 24 Miss. R. 173.

Any other rule would only be opening the door to fraud. The title of the heirs can only be defeated by it appearing that the assets, in the language of the English authorities, "*were originally deficient*" for the payment of debts.    The administrator is by law invested with the title to the personal estate, and he must administer it, if possible, so as to prevent, and not to create, a breach of the condition in the estate of the heirs, or more properly speaking, so as to relieve the estate from the condition.

But the point insisted on by the other side is, that the personal estate became insufficient to pay the debts through the action of the sovereign authority in emancipating the slaves; and that, therefore, the land has been made liable for the debts. We have seen that the title and possession, both, of the land vested in the heirs, subject to but one condition—that of a sufficiency of personal estate to pay the debts.    This personal estate

was placed in the hands of the administrator for the express purpose of relieving the estate of the heir from the condition annexed to his title. Now suppose the personal estate was sufficient before the act of emancipation to pay the debts, but has by that act been rendered insufficient, the case is then brought within one of the rules laid down by Chancellor Kent: "that if the condition become impossible to be complied with, either by the act of *God or of the law,*" "the estate being once vested, is not thereby divested."

As this is bound to be the turning point in the case, it is the one of course which merits the most consideration. After considerable search into the authorities, I am left where I was when I started, without any knowledge of any adjudicated case directly bearing upon the question. Indeed it would be rather remarkable if one could be found, as, perhaps, the same state of things never existed before to produce it. But I submit that the case is clear upon well-recognized principles of law.

The legal title to the personal estate was vested in the administrators. The law annexed to this title certain trusts. The first trust exists in favor of creditors, whose claims have to be satisfied before the heirs can claim anything.

The case then may be thus stated: The administrators held the legal title to the personal estate, the creditors the first trust, and the heirs the second trust, or interest in the *surplus* remaining after the payment of debts. Now bear in mind that this estate was the *fund* or *source* to which creditors had to look for the payment of their debts.

The moment the legal title vested in the administrators, the trust vested in favor of creditors; for the object which the law seeks to accomplish, by locating the title in the administrators, is to enable them to execute the trust; and this title exists as long as there is a trust to be executed. Now it would seem to be too clear a proposition to admit of argument; the loss must either fall upon the *legal title, or upon* the first trust which that title was held to satisfy; as no question can arise about the trust in favor of the heirs, until there is a surplus to which the trust can attach. If the loss must fall upon the legal title, then the

administrators must bear the loss; if upon the *cestuis que trust*, then the creditors occupy that relation, and they must bear the loss. The loss must fall exactly in the order in which the trusts attached to the property—and we have seen that the heir's trusts attach only to the surplus after the payment of debts—and they are not paid on account of a loss of the property; of course there can be no surplus to which the trust can attach. It may be true that, during the administration, the heirs can scrutinize the accounts of the administrators; but this is upon the idea that they are interested in the surplus, and have the right to have the administration conducted strictly according to law, that as large a surplus as possible may be saved out of the estate. But the administrators have the right, upon a mere *ex parte* showing to the court, to apply for an order of sale, and to dispose of the property upon such showing for the benefit of creditors.

But again, the law having set apart the personal estate for the payment of debts, and creditors having acquired in it a vested right—in the event of the government making compensation for the emancipated slaves, the creditors would of course be the preferred parties. Having the first claim upon the trust property for their debts, they would be the first to be satisfied by the government. Their rights were regulated by the laws of the State, setting apart the property for their debts; and these laws would have to appropriate whatever was received into the administration in lieu of the property. It is a legal presumption that all governments, when they interfere with the private property of their citizens, intend in due time to make compensation. But be this as it may, the governmental action must be construed according to old settled and well-defined rules. It is immaterial in what form the action of the government may come, whether in the form of an ordinary act of legislation, or in the form of a constitutional amendment, the same rules must apply in their construction and operation. If it is intended to interfere with vested rights, and to give to the action of the government a retrospective operation, then all the rules of strict construction apply, and nothing is to be

Evans *v.* Fisher.

embraced by implication. Strict construction means that only those things enumerated in the letter shall be embraced, and that implications come in only to explain and carry out what has been fully and clearly expressed. But suppose we treat the constitutional amendment as a remedial measure, and give to it a most liberal construction, how is the case changed? What was the scope and object of the amendment? Certainly not to benefit either debtor, creditor, or property holder. None of these entered into the thoughts of the government. The object was to emancipate the slaves—this was the scope and object of the measure—to confer freedom upon the African race; and if liberal construction comes in at all, it is in furtherance of this object. It might be argued, perhaps, as embraced under the rules of liberal construction or interpretation, that as freedom was the object, certain rights were incidental to freedom; that rights carried with them remedies, and that testimony was necessary to maintain remedies and make them efficient. These thoughts might possibly be allowed in the interpretation of this amendment; but nothing consoling to either creditor, debtor, or property holder, seems to flow naturally from the words, language, or scope and object of the amendment. They require no reflection to ascertain their ruin, and no amount of reflection can convince either class that he is the peculiar object of governmental bounty.

To sum up, then, how does the case stand?

First. The statute, making land liable to the payment of debts, being in derogation of the common law, must be strictly construed.

Second. The estate in the land having vested in the heirs, the law disfavors that state of things tending to divest a vested estate, and therefore brings to bear, in such case, all the rules of strict construction.

Third. If there was sufficient property, the title to which vested in the administrators to pay the debts, and the property, under the laws of the State, would have been made available for this purpose but for the action of the government, then under both liberal and strict rules of construction, the title of

42

the heirs is relieved from all conditions; and if it was ever relieved, for one moment of time, of the condition, it was relieved forever, because it is not to 'be presumed, without plain and unequivocal language, that the government intended a retrospective measure, which would conflict with other parts of the constitution. It is not in the power of legislation to restore a condition to a title which has been once relieved from it.

Fourth. Losses must fall either upon the legal title, or upon the trusts, in the order in which they attach to the title.

Fifth. The administrators had a vested interest in the property. They had a right to commissions and to use the property for this purpose. Creditors had also a vested right under the law for their debts. It was not in the power of the administrators to divest it from this purpose; and when the government interferes with such rights, those who have the rights must bear the loss. The fact, that the administrators and creditors have vested rights, shows that the heir's rights were contingent in the personal estate, which had been set apart by law for the payment of debts. The point in argument on the other side is admitted, that the rights of creditors were vested in the personal estate, to have it applied for the payment of their debts. Now, suppose the government should impair or destroy these vested rights, who bears the loss? Most certainly the parties whose rights have been violated.

It is again admitted that *primâ facie* the government is bound to make compensation for the *emancipated slaves*. What the government is *primâ facie* bound to do, the law presumes it will do. The government is presumed to intend to do, what an individual, under a like state of facts, could be compelled to do under the law. It is no answer to say that the government will not do anything, no more than it would be to say that an administrator, who had wasted an estate, was insolvent, and could therefore pay nothing. The Confederate Government burned cotton, under the implied understanding at least that it would pay for it; and the fact that that government has failed, does not change the attitude of the question. The only question is,

whether there was an act done for which, under the theory of the government, compensation ought to be made, if the government had been established.

But when the creditor's rights became vested in the personal estate, any act of the government affecting this vested right must be treated as an injury to that right, and the loss must be sustained by the party whose right was affected.

The difference between property destroyed by the act of God and by the act of government is this : The government, under its own theory, and under its fundamental law, intends to make compensation to the party whose right is affected.

In case of devastavit by an administrator, the creditor loses his remedy against the administrator in his *fiduciary* capacity, and is turned over to a personal remedy against him. So in case of a destruction by the government, the creditor has to take the compensation given, or to be given, by the government in lieu of the property.

Take again a case where a trustee has been robbed of trust funds, he is discharged because he was not blamable. But suppose the robber should afterwards pay back the money, it again goes into the trust; but until such payment, the *cestui que trust* has to rely on the robber.

*Johnson* and *Johnson*, for appellee, contended,

That the record in this case really presents but one question for the consideration of the court; and that question is this: When, on the death of a testator, there are ample assets and personal property to pay all the debts of the deceased, which personal property and assets have been lost or destroyed during a revolution or civil war, can the creditors of the estate claim that the lands of the testator shall be sold to pay the debts? Do the heirs-at-law, under such a state of facts, take the lands of their ancestor by way of inheritance, free from incumbrance; or are those lands chargeable for the debts?

It seems to us, that, on general principles, under our law, this question is exceedingly plain. Surely, no good argument can be employed in support of the proposition that, in such a case,

the heirs can enjoy the lands as an inheritance, whilst the debts of the ancestor remain unpaid.

Whatever may be the English doctrine, and the English decisions under the peculiar policy of primogeniture established in England, and the enactments there existing, framed for the purpose of preventing, as far as possible, the alienation of lands from the heirs of a decedent, and thus maintaining the perpetuity and power of the English aristocracy—we confidently assert, that the State of Mississippi, by her legislation, has established the principle that lands are dedicated, in all cases, to the payment of the debts of a decedent, when the available assets and personalty are insufficient for that purpose.

Our law provides, that, whenever an executor or administrator shall discover that the personal property will not be sufficient to pay the debts, he may petition the proper court for the sale of so much of the lands as may be necessary for that purpose; and that the court, on proof of the allegation of the petition, *shall* order a sale of lands to pay debts, the surplus of such sale, if any, to be distributed amongst the heirs-at-law.    Rev. Code, 1857, pages 445, 446, articles 88, 89.

When an estate is *insolvent* (as is the case now before the court), our law provides that the executor shall so declare to the proper court, appending to his petition an exhibit of the assets, and the debts and personal property on hand; and that, if the court shall be convinced that the estate is insolvent, an order shall be made for a sale of all the property, both real and personal, to the end that the proceeds may be equally divided amongst all the creditors who shall establish and present their claims, pursuant to the requirements of law.    Rev. Code, 1857, pages 448, 449, articles 98, 99.

Our statute, indeed, expressly declares that *the lands of a decedent are chargeable for all debts left unpaid, after the personalty shall have been exhausted.*    Rev. Code, 1857, page 443, article 80.

To show that the laws of Mississippi do not favor the policy of preventing the alienation of the lands of a decedent, we refer to the fact that our probate courts may, under certain

circumstances, order the sale of lands to pay debts, when there is plenty of personal property to extinguish all of the indebtedness.  Rev. Code, 1857, page 447, article 93.

Having thus shown that, in Mississippi, lands are in all cases *charged* with the payment of debts, when the personalty is insufficient for the purpose; that, in cases of insolvency (and Evans' estate is declared insolvent), all the lands *shall* be sold; and that in certain cases, lands *may* be sold in preference to personalty—we think that we are sustained in the assertion, that our laws dedicate all which an estate possesses, both real and personal, to the payment of the debt of a decedent, and that the heirs-at-law can, in no instance, receive an inheritance of lands whilst their ancestor's debts remain unpaid.

There is a principle of law, well established, which asserts that " a man shall be just before he is generous;" hence a person cannot, even by his last will, cast an inheritance upon another, whilst his creditors remain unpaid.

It is true, that, in the case now under consideration, the testator, Evans, left a large personal estate, amply sufficient, more than sufficient, to pay all his debts; that the personalty thus left, to the amount of $155,000, was lost and destroyed by the events of the war; and that the executors, who stood charged with that personalty, were discharged of the same by the order of the Probate Court, on a representation of the extraordinary manner in which the personal estate was destroyed. And it is also true, that, if the country had remained peaceful and tranquil, the debts of the estate could have been all paid, merely by keeping the estate together and planting crops during the time provided for in the will.  We cannot see, however, that this unfortunate result, realized by so many thousands of the Southern people during the progress of the terrible war from which the country has recently emerged, changes, even in the slightest degree, the *legal aspect* of the question presented by the record before us.  Where is the justice in placing the loss of the personalty of Evans' estate upon the creditors, and casting a rich inheritance in lands upon his heir?  Those creditors

are not shown to have been instrumental in producing the loss, and they should not, therefore, be held responsible.    Let us suppose that Evans, the testator, had survived the war and the loss of his personalty, would not he, if living, have been still liable for every cent of his debts, even to the last acre of his *lands?* Unquestionably so.    Being dead, by what rule of law or justice can it be contended that his demise released his lands from liability to the just claims of his creditors?    What *right* has an heir-at-law, under our statutes, above cited, to claim and enjoy an inheritance, whilst his ancestor's honest creditors remain unpaid?    We admit that the destruction of the cotton of this estate, and the emancipation of its slaves, was a great misfortune; but the loss properly falls on the estate.

There is no reason for saying that the executor is liable, under the circumstances, for the loss of the personalty returned in his inventory and appraisement.    The creditors clearly have no claim on *him*.    The executor acted in good faith, and with all diligence and care.    *He* could not shield the personalty which he held in trust for the creditors and heirs from the overpowering military force and lawless aggression which destroyed it.    Suppose that, in peaceful times, the cotton of an estate should be destroyed by fire, and all the slaves be swept away by an epidemic, would it be sound reasoning to say that, therefore, the *lands* should be reserved from alienation for the payment of debts, and descend absolutely to the heirs-at-law? Certainly not.    There would be gross injustice in such a course, as well as a palpable violation of the statute above cited, which *charges* the lands of a decedent with the payment of debts, when, from any cause, the personalty is insufficient.

It matters not *how* the deficiency of personalty may be produced.    Whenever the deficiency exists, the lands can be resorted to for a fund to pay the debts of an estate.

Nor would the case be different, if the fact existed (as it does not in this case), that the deficit of assets was produced by mal-administration; for, in such a case, the lands must be sold, and the heirs-at-law look to the bond of the executor for indemnity.

It has been decided by this court, that the jurisdiction of the probate courts over the lands of a decedent, for the purpose of paying debts, is as ample as it is over the personalty, and that the lands are equally liable for the payment of debts as the personalty; the personalty, however, to be exhausted before resort is had to the realty. The court says: " It is manifest that lands are subject to administration for the payment of debts, as of the assets of the deceased, at the time of his death." *Lee* v. *Gardner*, 26 Miss. R., page 543.

We are aware that it has been decided by this court that, where assets sufficient for the payment of debts have been wasted by the administrator by acts amounting to a *devastavit*, the heir may urge this as a reason why the lands which descended to him shall not be sold to pay debts. *Turner* v. *Ellis*, 24 Miss. R., page 173.

No doubt this principle is correct; but, in the case now before the court, the record shows no such question as to wasting assets. Indeed, it appears that there was no *devastavit*—no wasting of assets on the part of Evans' executors; but that, on the contrary, the cotton was destroyed by overpowering military power in time of war, and that the slaves were emancipated by the acts of the general government. It was by these means that the executor was forced to resort to the lands to pay the debts of the testator. From all that appears by the record (and the fact is no doubt so), the executor acted in all good faith, and with diligence in the administration of the assets; and that the personalty was lost by means beyond his control, and by events and occurrences for which he is not responsible. This being the case, the executor and his sureties are not liable to the creditors on the official bond; and there being no liability in that quarter, the right under the statute of recurring to the lands for the payment of the debts, remains unimpaired.

Chancellor Kent, in his Commentaries on American Law, lays down the whole doctrine with great distinctness. He declares that the descent of real estate to an heir renders him liable for the debts of the ancestor to the extent of the inheri-

tance; that, although the English rule is that the heir is not bound for simple contract debts, nor even by a specialty, unless expressly named, yet that rule, which the commentator condemns as hard and unjust, he says has been abrogated in the United States; and that the rule here prevails, in all the States, that the lands descended to the heirs are liable to the debts of the ancestor, equally, in all cases, with the personal estate. 4 Kent's Com., 4th edition, pages 419–422.

The same author declares, as a general rule of law, in this country, that, whenever the personalty becomes insufficient, the executor may and should sell lands for that purpose. Ib., page 438.

Without further investigation, we submit the question presented to the consideration of this honorable court.

HANDY, C. J., delivered the opinion of the court.

This is an appeal, by the heir-at-law of Samuel W. Evans, deceased, from a decree of the Court of Probates, ordering a sale of the real estate of the deceased, for the payment of his debts.

It appears, by the record, that the will of the deceased was admitted to probate in January, 1860, by which he directed that his property should be kept together until January, 1864, and that his debts should be paid by the proceeds of the crops; that the executors received credit on their inventory for the slaves and other personal property of the deceased, amounting to the sum of $155,000, including five hundred bales of cotton destroyed by the two armies during the progress of the recent war; and that the slaves were either lost to the estate by emancipation by the government, or by their desertion to the Federal forces; that, but for these losses, the property of the estate would have been amply sufficient to pay the debts of the testator; and in consequence of these losses, the personal estate was insufficient to pay the debts. Under these circumstances, the executors filed their petition, praying that the personal estate should be decreed insolvent, and that the real estate should be decreed to be sold for the payment of the debts. The petition

was granted in both respects, and this appeal is taken from so much of the decree as orders a sale of the real estate.

We are not called upon, in this case, to . determine whether the credit allowed to the executors for the losses of personal property sustained by means of the war or of the action of the government, was proper or not; or whether the decree of the court, declaring the estate insolvent, was correct or not under the circumstances of the case.   No objection is here urged on either of those grounds; and the action of the court, in both these respects, must be here taken to be correct. We are only to determine here what is the result of these facts upon the rights of the heir-at-law, and of the creditors of the estate respectively, in relation to the real estate of the testator.

It is insisted, in behalf of the appellant, that the real estate of the testator descended, immediately on his death, to the heir, who was entitled to hold it subject to a *condition subsequent* that it should be necessary to pay the testator's debts; which necessity could only arise by the personalty being insufficient, *at the time of his death,* to pay his debts; and, if the personalty was sufficient, at the time of his death, for that purpose, that the heir then took the estate exonerated from ·the debts, and that no supervening insufficiency, resulting from any cause whatever, could render the real estate liable for the debts.

The earnestness with which these views have been urged by eminent counsel, has induced us to give them more consideration than we had supposed they deserved.

We will first consider what were the general rules of law in relation to the liability of the property of a deceased person for the payment of his debts.

By the common law, all the personal property of which a person died possessed, became liable to his debts; but his real estate of freehold descended to the heir, and was chargeable only with debts due by specialty, in which the deceased bound himself and his heirs, and was not subject to the payment of simple contract debts, nor even of specialties unless the instrument indicated· an intention to bind the heir.   But these rules

have been materially altered by acts of parliament passed at various times; and, by the act of 3 and 4 William IV., chapter 104, the land of every debtor, whether copyhold or freehold, which he had not charged with, or devised subject to, the payment of his debts, is made assets, to be administered in equity, for the payment of both simple contract and specialty debts, reserving to creditors by specialty, in which the heirs are bound, the same priority which they originally possessed. And now, by the law of England, legal assets, for the payment of the debts. of the deceased, are defined to be, "those portions of the property of the deceased of which his executor or heir may gain possession, and in respect whereof he may be made chargeable, by the process of the ordinary tribunals, and without the necessity of equitable interference;" and they consist, first, of the personal estate to which the executor or administrator is entitled by virtue of his office; and, secondly, of the real estate descended or devised, except where the devise is for the payment of the debts. Adams' Eq. 252, 253. And Mr. Jarman says, that the result of these statutes is, "that every description of property now constitutes assets." 2 Jarman on Wills, 543, 4th Amer. edition.

In this state of the law, it has never been doubted in England, that both the real and personal estate were equally liable to creditors; and that it was discretionary with the creditor, if his debt was of such a nature as to bind both the real and personal estate, whether he would resort to the personalty in the hands of the executor, or to the real estate descended or devised. 2 Williams' Exrs. 1532, Part 4, Book 1, chapter 2, section 1 (5th Amer. ed.). And, of course, if there was a deficiency in either, for any cause, to pay his debt, that would not affect his right to proceed against the other fund, which was equally liable for his debt.

Yet it is "the general rule of the English and American law, that the personal estate is the primary fund for the discharge of the debts, and is to be first applied and exhausted, even to the payment of debts with which the real estate is charged by mortgage." 4 Kent's Com. 521 (8th ed.). This

rule had its origin, in England, in the superior importance attached to real estate under their political system—which continued, to some extent, even after the common law rule above referred to was abolished by statute; and it has been acquiesced in and sanctioned, as a rule of practice, by American courts generally, as a mere matter of expediency. But it has never been held, either in England or in this country, that the real estate was not chargeable with the payment of debts, equally with the personalty, or that, in case of any deficiency of the latter, without the fault of the creditor, the real estate was not chargeable with the debts. And, indeed, the rule of priority appears to be a mere rule of administration of assets, where those of both kinds are admitted to be equally liable for debts, without regard to the condition of each other. See authorities cited in note to 2 Williams' Exrs. 1526, 1532.

The alteration of the rule in England proceeded on the just policy to make the whole of a man's property, of which he died seized and possessed, liable to the payment of his debts, because such a rule was most consonant to principles of honesty and justice. And, for the same reason, this policy has been very generally, if not universally, adopted in the States of this Union. Chancellor Kent says, that "the rule prevails generally in the United States that the lands, descended to the heirs, are liable equally in all cases with the personal estate."

The legislation of this State is in entire accordance with the rules and policy now established in England, and prevailing generally in the United States.

The first provision on the subject is in article 80, Rev. Code, 443, as follows:

"The goods, chattels, personal estate, choses in action, and money of the deceased, or which may have accrued to his estate after his death, from the sale of property, real or personal, or otherwise, whether he died testate or intestate, shall be assets, and shall stand chargeable with all the just debts and funeral expenses of the deceased, and the expenses of settling the estate; and the lands, tenements, and hereditaments of the testator or intestate, shall also stand chargeable for the debts, over and above

what the personal estate may be sufficient to pay, and may be subjected to the payment of debts, in the manner hereinafter directed, saving to the widow her right of dower."

Then it is provided, that when any executor or administrator shall discover that the personal property will not be sufficient to pay the debts, he may petition the Court of Probates for a sale of the lands of the deceased, and he shall then exhibit a full, just, and true account of the personal estate, and of the debts due from the deceased; and that the court shall give notice of the application, and shall afterwards hear the proofs on both sides; and if the court shall thereupon be satisfied that the personal estate is insufficient to pay the debts of the deceased, and that the land ought to be sold for that purpose, it may make a decree for that purpose.   Rev. Code, 445, articles 88, 89.

Again, the executor or administrator is required to take all proper steps to ascertain whether the estate will be solvent or insolvent; and if it be ascertained that the estate, both real and personal, will be insufficient to pay the debts of the deceased, he shall exhibit a true account of the personal estate and assets, and a true list of the lands of the deceased, and a schedule of the debts; and if it shall appear that the estate is insolvent, the court shall make an order for the sale of the lands, and the proceeds of the sale and all other assets shall be equally distributed *pro rata* among all the creditors.   Ib. 448, article 98.

It is manifest that the effect of these statutes is to render the real estate of the deceased chargeable with his debts, "over and above what the personal estate may be sufficient to pay;" and they were plainly founded on the policy, which so generally prevails in this country, to subject all a man's property to the payment of his debts.   But the rule of priority in the application of the personalty before the real estate to that purpose, which prevails both in England and in the States of this Union, is also established.

But the question here presented is, whether, if the personalty be sufficient at the time of the testator's death, and afterwards turn out, for any cause whatever, without fault on the part either

of the heir or of the creditors, to be insufficient to pay the debts, the creditors can resort to the real estate for that purpose, through the executor and in the Court of Probates.

In support of the negative of this proposition, it is said that the lands vested in the heir immediately on the death of the deceased, *subject to the condition* that they should be liable to the debts, if it should become become necessary to apply them to that purpose, by reason of the insufficiency of the personalty. But we do not consider this view tenable.

It has been held by this court, that, under our statutes, the lands of the deceased are liable to the payment of his debts equally with the personalty, the latter being only first required to be exhausted; that they are subject to administration for the payment of his debts, *"as of the assets of the deceased, at the time of his death;"* and that, in the contingency of the deficiency of the personalty, they become as completely subject to the payment of debts as the personalty and assets, upon the same principle as the personalty—*their liability, as such, having relation back to the death of the deceased. Lee* v. *Gardner,* 26 Miss. 541, 542. It is true, the legal· title descends to the heir, who is entitled to enjoy the estate until the contingency arise when the land may be required to be appropriated to the payment of the debts. But he holds it *subject to the charge* of the debts of the ancestor, which may be enforced whenever it is found that the personal assets are insufficient to pay the debts. This charge is affixed to the lands by law, at the time of the testator's death, though it may not be enforced until the deficiency of the personalty be ascertained; and the heir holds the legal title, in the interim, subject to this charge, whenever it shall be made to appear that the necessity for enforcing it has arisen. It is· a case of a *charge on the lands,* and not that of a title held on *condition subsequent.*

Again, it is contended that the deficiency must exist at the time of the death of the deceased, in order to make the real estate chargeable; and that the question of the sufficiency of the personal assets must be tested by their condition at the time of his death.

We do not think that the statutes will admit of this construction, for several reasons:

1. It is not consistent with their phraseology. The first provision is, that the lands " shall be chargeable for the debts over and above what the personal estate *may be* sufficient to pay; " that is, *may, in the course of administration,* be found to be insufficient. This language is prospective, and is not reconcilable with the idea that the liability of the lands was to be governed by the condition of the personal estate at the time of the death of the deceased. Then the executor is required to give notice for the presentation of claims, and creditors are allowed two years to present them. Again, " *when* the executor or administrator *shall discover* that the personal estate *will not be* sufficient to pay the debts," he may apply for the sale of the lands. Thus, the application to sell the lands may be made *whenever the executor shall discover* the insufficiency of the personal assets. He is not limited to any particular time in taking the step, nor to the condition of the personal estate at any particular time. The terms employed exclude the idea, that the step is to depend upon the condition of the personal estate at any other time than *when he shall discover* that the personal estate, in due course of administration, " *will not be* sufficient " to pay the debts. Again, the executor is required, at the time of presenting his petition, to exhibit " a full, true, and just *account of the personal estate* " of the deceased. This clearly appears to contemplate that the personal estate may be different in amount or value at the time of the application to sell the lands, from what it was at the time of the death of the deceased. For, otherwise, there could be no necessity for this account at the time of making the application ; since there would already have been made and returned to the court an inventory, showing the amount and value of the personal estate at the time of the death of the deceased. The account referred to must have reference to the condition of the estate at the time of the application. Again, it is provided, that, if *on the hearing of the petition* " the court shall be satisfied that the personal estate *is* insufficient to pay the debts," a decree may be made for the

sale of the lands; which shows that it was the condition of the personal estate at the time of the hearing that was intended to control the action of the court.

The language of these various provisions appears to look to the condition of the estate as it was, in the due course of administration, at the time of the application for the sale of the lands, and at its hearing; and cannot have reference to the time of the death of the deceased.

2. This view of the phraseology is fully sustained when we consider the spirit and policy of these statutes.

That policy evidently was to subject all a deceased person's property, real as well as personal, except such as was positively exempt, to the payment of his debts, in the due course of administration; and the only difference, in respect to the liability of both kinds of his property for that purpose, consisted in the order of application. But both were equally bound in the course of administration appointed by law. From the very nature of that trust, it must have been considered that it must require time to administer the estate, to give to creditors and others interested in it the benefit of the assets, and to determine its condition. And positive provisions are made, looking to the necessary delays. The creditors are prohibited from bringing suit until the expiration of nine months after the grant of administration. Two years are allowed for the production of claims against the estate, and many other delays are necessarily incident to the administration, and final settlement of it. During all this time, the personalty is subject to all the accidents which may in any way affect it. To suppose that the Legislature intended that the rights of creditors against the real estate should be fixed by the condition of the personalty at the time of the testator's death, or even of the grant of administration— when they were prohibited from suing, and when, in the course of administration to which they were compelled to submit, all the personal assets might be lost to them without their fault— would be to convert the administration into an instrument of oppression, and to defeat the very policy plainly intended by the statutes—to give to creditors the benefit of all the property

of the deceased, by debarring them of their rights against a most material part of it. It would be clearly contrary to that policy to say that the creditors' rights were to be determined by the condition of the estate at a time when they had no power to enforce their debts by suit or otherwise, and that they should accept the mere fact of its sufficiency at that time, as a satisfaction of their debts against the estate, without regard to the circumstances which caused the assets to be lost to them. It was by and through the administration of the estate, that the creditors' debts were to be paid. They were compelled to await the course of that administration, and hence it is manifest that their right should be determined by the condition of the estate at the time when they were to have the assets applied to the payment of their debts, in the due course of administration, and that they should not be lost by reason of its condition at a time when they were powerless to have the assets applied to the payment of their debts, or in any manner to obtain the benefit of them.

According to the argument of counsel for the appellant, if the personal assets were sufficient in value at the time of the testator's death, and, afterwards and before they could be applied, in the due course of administration, to the payment of the debts, they became depreciated, without any fault of the creditors, or of the executor, so that they were insufficient to pay the debts; or if, by the act of God or other sufficient legal cause, they were destroyed and totally lost; the loss would fall on the creditors, and the real estate would be exonerated from the debts. If this were a correct view of the subject, the result would be that a part of the fund charged by law with the payment of the debts, would be preserved to the use of the heir; and the creditors, who were intended by law to have the benefit of that fund, in case of the insufficiency of the personalty, would be deprived of that right, without fault on their part, and without remedy, the land remaining to the benefit of those who were bound in law to appropriate it to the discharge of the ancestor's debts. This would be to discharge a part of the fund intended by law to be subject to the payment of debts, and in

palpable violation of the policy of the law, and of the purposes of natural justice intended to be accomplished by it.

It appears, therefore, to be evident, that the sufficiency of the personal assets which the law contemplates as exonerating the real estate from the debts, must be tested by the condition of the personalty as developed in the due course of administration, and when in that way the assets are to be applied to the payment of the debts. No time is positively fixed by the statutes when the deficiency is to be ascertained, but it is clear that it must be referred to the course of administration; for in no other way could the policy of subjecting the real estate to the payment of the debts be made effectual, or the necessity of the application be judicially ascertained.

The authorities relied on by counsel for the appellant do not sustain the view on this point contended for by them.

The cases in 1 P. Williams, 494, and *Noel* v. *Robinson*, 1 Vernon, 94, were cases *between legatees;* and it was held that the legatees who had been paid their legacies in full would be compelled to refund, in proportion, to an unpaid legatee, if there was an original deficiency of assets to pay all the legacies, and the executor was insolvent; but not, if there was no such original deficiency, and there had been a waste by the executor; the reason of the distinction being, that the other legatees, in the first instance, had received more than their just proportion of the assets; but, in the second, no more than their proportion. This is the rule *as between legatees.* But the rule is different as between creditors and the legatees; and it is settled, that on waste by the executor, a legatee who has been paid must refund in behalf of a creditor. *Hardwick* v. *Mynd*, 1 Aust. 112; Anon., 1 Vernon, 162; *Lupton* v. *Lupton*, 2 Johns. Ch. R. 614, 627. Mr. Williams states the rule thus: "When the testator's funds, at the time of his death, are not sufficient to pay both debts and legacies, it is clear that an unsatisfied creditor can compel a satisfied legatee to refund, whether the legacy was paid to him voluntarily or by compulsion; and *he has the same right, although the testator's funds, at the time of his death, were sufficient to pay both debts and legacies.*" 2 Williams' Exrs.

1308, 1309 (5th American edition). And the legatees are liable to a creditor when the executor has misapplied or wasted the assets, and become insolvent (*Stuart* v. *Kissam*, 2 Barb. Sup. Court R. 493); and if the undisposed of assets are exhausted and are insufficient to pay the debts. *Doriocourt* v. *Jacobs*, 1 La. Ann. 214. Judge Story states the reason of these distinctions to be, that legatees are always compellable to refund *in favor of creditors*, because *the latter have a priority of right of satisfaction out of the assets.* 1 Story's Eq. Ju., section 92, and the cases there cited. And the same principle is applicable as between the creditors and the heir.

The case of *Turner* v. *Ellis*, 24 Miss. 173, which is relied on, was a petition by an administrator *de bonis non*, to sell the real estate of the deceased for the payment of debts; and a party who had purchased the lands from the heirs, pending the administration, resisted the application to sell, on the ground that the original administrator had neglected to administer certain personal property, and to apply it to the payment of the debts, in consequence of which the estate had become insolvent. It was held, that if the personal estate had become insufficient in consequence of the *devastavit* or neglect of duty of the administrator, the heir-at-law could successfully resist the application to sell the lands on that ground; and that the creditors' remedy was by an action on the administrator's bond. It does not appear that the administrator and the sureties on his bond were insolvent, and nothing is said as to the rights of the parties in that contingency.

*Payne* v. *Pendleton*, 32 Miss. 320, also relied on, was a petition of like nature; and it appeared, from the proceedings in relation to the administration, that there were assets in the hands of the administrator largely exceeding the amount of the debts brought against the estate, which had never been administered or accounted for by the administrator. It was held that that was good ground for refusing to decree a sale of the lands; and if the assets were wasted by the administrator, the creditor's remedy would be against the administrator and sureties on his bond, and that the *devastavit* would be no good ground for order-

ing a sale of the lands, unless the creditor had exhausted all remedy against the administrator and his sureties.

It is to be observed that neither of these last two cases gives any support to the position that the question of sufficiency of the personal assets is to be determined by the condition of the estate at the time of the testator's death; but, on the contrary, they appear to recognize the principle that the sufficiency is to be determined during the course of administration. But they both hold that in case of a *devastavit*, the creditor's remedy would, at least in the first instance, be upon the administrator's bond; and the last holds that the lands should not be decreed to be sold in such a case unless the creditor had exhausted his legal remedy against the administrator and his sureties. Thus the ultimate liability of the lands for the payment of the debts, in case of insufficiency of the personalty, and of the insolvency of the administrator and his sureties, is recognized. And that rule appears to be founded in good reason, and to be sustained by the authorities above cited.

The extent to which these cases go is, that the lands will not be decreed to be sold, in the first instance, when the insufficiency of the personalty has been occasioned by the neglect of duty or the *devastavit* of the administrator. They do not touch the question here presented, of *an insufficiency produced by causes for which the executor was not liable, and on account of which the creditors were without remedy ;* for we assume that there was no liability on his part, since it is conceded by both parties.

It is plain that, as this case is here presented, there was no recourse of the creditors against the executor, and that no remedy was left them but the sale of the real estate for the payment of their debts. It is not pretended that the loss of the personalty was in anywise attributable to the fault or laches of the creditors; and, hence, all the rights which the law gave them, against the estate of the testator, were retained in full force.

The case presented, then, is simply one where the creditors had two funds chargeable with the payment of their debts— primarily, the personal assets ; and, on the ascertained deficiency

of that, secondarily, the real estate, of the testator. The former has been lost without any fault on the part of the creditors, leaving their debts unsatisfied; and the simple question is, whether the fund secondarily liable should not be appropriated to the payment of the debts.

It is said that the case is analogous to that of a levy on personal property sufficient to satisfy an execution at law, where, after the property is taken out of the defendant's possession by the sheriff, it is wasted or lost under circumstances which would render the sheriff liable; in which case the execution would be satisfied as to the defendant. But this is expressly on the ground of the *loss of the property* to the defendant, and by act of the sheriff which would render him liable; for if the property be not actually taken from the defendant's possession, or, after being taken, it be lost under circumstances showing no fault on the part of the sheriff, and that would discharge him from liability—as the act of God or of the public enemy, or the act of the law—the execution would not be satisfied as to the defendant. *Wade* v. *Watt, Noble & Mobley*, at this term.

Here, there was no taking of the property from the possession of the heir, by the creditors or for their benefit; for the cotton and negroes appear to have remained on the plantation of the testator, in accordance with his will, until the cotton was destroyed and the negroes deserted or were set free by the act of the law. Nor is there any liability for the loss, on the part of the executor, as is admitted. The creditors have, therefore, no recourse on any one on that account.

It is also said to be resolvable on the principle of a person having a large estate and indebted to an inconsiderable amount compared to the value of his property, who made a settlement or gift of a small part of his property to his wife or children, leaving amply sufficient to pay his debts; and afterwards, at a distance of time, his remaining property should be lost or squandered so as not to leave sufficient to pay his debts—in which case, it is said, the property conveyed would be exonerated. But the validity of such a conveyance is at least questionable. If it could be maintained at all, it would be on the

equitable principle, that the creditor had lost his claim against the property conveyed, by his laches in not pursuing his claim against the remaining property of the debtor for an unreasonable length of time, when he might have done so ; and that it would be inequitable to subject the property conveyed after such laches. But we intend to express no opinion upon such a case, and only to say that it bears no analogy to the case before us. There was no laches imputable to the creditors in this case ; for there was no time, so far as the record shows, when they could have subjected the personal assets to the payment of their debts. But the property appears to have been "kept together" in accordance with the testator's will; and that certainly is a justification to the executor, and to th ecreditors if they acquiesced in it, so far, at least, as the heir-at-law is concerned, in not selling the property for the payment of the debts. But the fact that the executor was allowed credit for all this property, and that no objection is made to the action of the court below in that respect, must be taken as conclusive in the case as here presented, that no neglect or omission of duty was committed by the executor, and that no fault is imputable to the creditors. It must be taken that the conduct of both was without wrong.

Again, it is said, that since the personal assets were lost to the estate through the action of the government, it must be presumed that the government will make reparation for the injury ; and that the compensation thus rendered will inure to the benefit of the creditors, and that they should be remitted to that, because it was the primary fund for the payment of their debts. But that resource cannot be regarded, by the law, as a fund to which creditors must be remitted. It has no existence in law, and depends wholly on the discretion of the government, both as to its being granted, and as to the persons to whom granted ; and it is, at best, very problematical, and exceedingly improbable, of ever being realized. The right of creditors, therefore, to proceed against a fund which is clearly liable for their debts, cannot depend on what the law cannot regard as a fund to which the creditors may resort. And the only view that the law can

take of the fund proceeding from the personal estate here, is to consider it as lost.

But, if this resource could be taken into consideration in this case, it should not affect the rights of the creditors. We have above seen that both the real and personal assets were equally bound for the payment of the debts; and the general rule in such case is, that the creditors may resort to either, when the other cannot be subjected. But a party whose rights are affected by the subjection of a fund in which he is interested, is not without remedy, under the doctrine of marshalling of assets. The equitable rule in reference to such cases is, that "if a person, having a claim upon two funds, chooses to resort to the only fund upon which another has a claim, that other person shall stand in his place for so much against the fund, to which otherwise he could not have access." 2 White and Tudor's Eq. Cases, Part 1, marginal page 63, *Aldrich* v. *Cooper*, and notes of cases there cited.

And it is an established rule, that if the creditor proceed against the real estate, descended or devised, the heir or devisee, who has sustained the loss, shall be allowed to stand in the place of the specialty creditor, to reimburse himself out of the personal estate in the hands of the executor. 2 Williams' Exrs. 1532. According to this rule a legatee or the heir would be entitled to the benefit of whatever fund may accrue to the estate by compensation made by the government, after the payment of all debts, if the lands which descended to the heir-at-law should be first appropriated to the payment of the debts, unless that result should be interfered with by the terms of the grant from the government.

But, apart from this, it is clear that the fund arising from the personal assets having been lost without the fault or wrong of the creditors, they are entitled to have the real estate applied to the payment of their debts.

The decree of the court below is in accordance with this view, and it must be affirmed.

HARRIS, J., delivered the following dissenting opinion:

I do not concur in the opinion of the majority of the court in this case. The point to be decided is, whether if, at the time of the death of the decedent, his personal assets were " *sufficient* " to pay all his debts and liabilities, funeral expenses and expenses of administration, the title to the real estate vested in the heir, by our statute of descents and distributions, can be divested or defeated by the subsequent waste, misapplication, or destruction of such *personal* assets.

There is no principle of public policy more obvious than that which inculcates the propriety of providing an owner for property under every possible state of things. Hence, upon the death of an individual, the disposition of his estate is carefully provided for by the municipal laws of all enlightened nations. The indulgence of disposing of it by will has long since been extended to the owner everywhere ; and if he fails to avail himself of that indulgence, or, in other words, dies intestate, his estate is disposed of by the law among those whose claims upon it are deemed strongest ; and in conformity with certain fixed rules, varying according to the character of the subject. Thus, if a man dies intestate, his *real* estate *descends* to his heir-at-law, who is defined to be a person upon whom *the law* casts this estate immediately upon the death of the ancestor ; and this method of acquiring title to *real estate*, by the single act and operation of the law, constitutes what is denominated by the laws of England as *title by descent* (1 Tuck. Lect., 2d part, 397 and 186) ; whereas his *personal estate* is, *by the law*, peculiarly constituted as a fund for the payment of his debts, after satisfying which, it is distributable among his next of kin, according to their natural claims upon his bounty. The character of *this estate*, together with the variety of individuals who may be interested in it, as creditors, legatees, or distributees, seems to demand that it also should be *vested by law* in some common agent, who shall preserve it from waste, and dispose of it to those entitled to receive it according to the provisions of that law, which has undertaken to provide for the discharge of the duties omitted by the intestate. The creation of this *agent* the law wisely leaves to the discretion of the ancestor, if

he chooses to exercise it; he may make his own will, instead of leaving it to the *law* to make one for him, and he may appoint his own agent or executor, instead of confiding this duty to the Probate Court under the authority of the law. If the ancestor by will appoint his own agent or executor, he thereby becomes invested with the *title* to the property in a fiduciary character. But if, either designedly or otherwise, the ancestor die without executing his power of testamentary disposition, *the law,* as in the case of real estate, assumes upon itself the duty of appointment, and vests this title and authority over the *personal estate* in a common agent for the parties in interest, who is called an *administrator.* 1 Tuck. Lect., 2d part, pages 397, 398.

At common law, executors and administrators were liable to the parties in interest—creditors, legatees, or distributees—to the extent of the assets, or *personal estate,* vested in them by law; and the heir of the ancestor was liable to creditors, on those bonds, covenants, or other specialties by which the deceased had *bound himself and his heirs,* to the extent of the real assets, or estate descended to him. The heir was not responsible to creditors generally, nor was his *title by descent* affected by any debt of his ancestor, unless in cases where by act of the ancestor himself, or by the act or operation of law, a lien had been created or attached to his real estate, in his lifetime; as in cases of judgments, recognizances, mortgages, etc. And even in these cases, the personal estate in the hands of executors or administrators is the primary and natural fund, which must be resorted to in the first instance, for the payment of debts *of every description,* contracted by the testator or intestate. 2 Williams on Exrs., page 1526, note 2, and numerous authorities cited; and page 1531, and note (1).

In cases of judgments against the ancestor, or recognizances acknowledged by him, the heir was not liable in an action of debt, but *chargeable* as *tenant of the lands,* upon *scire facias,* and not *as heir.* But in cases where the ancestor bound himself and "*his heirs,*" *nominatim,* the heir was liable *personally* in an action of debt, to the extent of the *assets real,* descended, and vested in him by operation of law.

This claim or charge against the heir was not, however, in the nature of a *lien* on the land, and therefore did not affect it in the hands of a vendee, to whom the heir may have sold it, with or without notice.   It was a *charge* upon the heir, only in respect of the land ; though the land might be reached by execution on a judgment against the heir, if he had not sold it. 1 Tuck. Lect., Part 2, 431; 2 Tuck. Lect., page 111 ; Co. Litt. 102 ; 2 Bacon, title Execution, I ; 3 Bacon, title Heir and Ancestor, F.

Thus stood the common law, when the act of William and Mary, 3 and 4, chapter 14, gave a right of action against the *devisee* of the debtor, concurrently with the heir, to specialty creditors, whose demands were recoverable by action of debt. 2 Jarman on Wills, page 509.

The subsequent act of 47 George III. let in the claims of simple contract creditors upon the real state of the decedent, if, at the time of his death, he was subject to the bankrupt laws.

The statute of 11 George IV. and 1 William IV., chapter 47, extended only to specialty debts of the decedent, and to simple contract debts of such decedents as, at the time of their death, were subject to the bankrupt laws.

The act of 3 and 4 William IV., chapter 104, passed on the 29th August, 1833, for the first time in England, subjected the real estate of the ancestor to the payment of simple contract debts generally, as assets to be administered in a court of equity, preferring, however, specialty creditors.

None of these acts, however, have any force or validity here. The act of William IV. was only passed in 1833, more than ten years after the policy of this State had been fixed by the legislation now under consideration, and the previous acts have no bearing upon the questions to be decided here, if they had ever been in force in this State.

In the case of *Boarman* v. *Catlett*, 13 S. & M., page 152, this court held, in accordance with previous decisions,' ' that no English statute has any intrinsic validity here."   When the Mississippi territory was organized, the ordinance secured the inhabitants in the enjoyment of judicial proceedings, according

to the course of the common law. This, together with the provisions in the constitution of 1817, schedule section 5, has been considered to exclude all English statutes, and to adopt only the common law, and the statutes of our own government, for the determination of the rights of the citizen—Citing *Morgan* v. *Reading*, 3 S. & M. 399. See also *Sessions* v. *Reynolds*, 7 S. & M., page 132.

In any view, therefore, these statutes can have no force or application in this discussion.

There is another provision of the common law worthy of notice (before we come to notice the legislation of this State), and that is a distinction growing out of the *sufficiency*, or deficiency, of personal estate.

In the case of a *sufficiency* of *personal estate*, at the death of the decedent, which has been wasted by the executor, a legatee of the personal estate is not bound to refund to another legatee, because he has received no more than was due to him, and the other legatees must look to the executor. But he *is* bound to refund to *creditors*, because the *personal estate*, being the primary and natural fund for the payment of debts, is made assets, and stands chargeable, as a trust fund, for that purpose, and may be followed into the hands of legatees, or distributees, by creditors in equity.

In the case of an *insufficiency* of *personal estate* to pay debts or legacies, the legatee who has received his legacy out of the personal estate, is bound to refund to creditors the whole legacy, if necessary, to pay debts; and also bound, after debts are paid, to refund to the other legatees, all over his just proportion, under the deficiency existing at the death of the ancestor.

Where, however, the *personal estate was sufficient* at the death of the ancestor, to pay his debts, and was subsequently wasted by the executor or trustee; or even where the real estate was charged with the payment of debts in the hands of the executor or trustee, and the executor or trustee wasted the fund provided for the payment of debts, the creditor could not subject the land, in the hands of the heir or devisee, to the

payments of debts, but was compelled to resort to the default-ing executor or trustee.

This doctrine is admitted by the opinion of the majority of the court, so far as it relates to legatees; but it is insisted that creditors, in case of a *sufficiency* of personal property or assets for the payment of debts, which have been wasted by the administrator, are not driven, like legatees, to their remedy against their defaulting agent and trustee, but may resort to the real estate of the heir; and for this the cases of *Hardwick* v. *Mynd*, 1 Aust. 112, 1 Vernon, 162; *Lupton* v. *Lupton*, 2 Johns. Ch. R. 614, W627; 2 illiams on Exrs. 1308, 1309; *Stewart* v. *Kissam*, 2 Barbour's S. C. R. 493; *Donocourt* v. *Jacobs*, 1 La. Ann. R. 214; and 1 Story's Eq. Ju., section 92, are relied on.

I have carefully examined the cases referred to, and many others of the same character (except the case of *Hardwick* v. *Mynd*, 1 Aust. 112, which I am unable to find in the library). These authorities only go to the extent that where there was a sufficiency of *personal estate and assets* which have been wasted by the administrator, that the legacies *paid*, or the personal assets dedicated by the law *as a trust fund for the payment of debts first*, may be recovered or subjected in equity by credit-ors in the hands of legatees, notwithstanding maladminis-tration. They were cases involving *personal estate* or assets, and not real estate in the hands of the heir or devisee.

But I find no case where it has ever been held in England, or in this country, under a statute like ours—and they are many—that where, at the death of the decedent, there was a sufficiency of personal estate and assets to pay the debts, which were sub-sequently wasted by the administrator, that the creditors might subject, to the payment of these debts, the land of the heir or devisee. On the contrary, as far back as 1689, in an anony-mous case constantly cited since, reported in 1 Salk. R., page 153, where a man limited an estate to trustees for payment of debts and legacies, the trustees raised the whole money, and the heir prayed to have the land; and this was opposed, because the trustees had not applied the money, but converted it to their

own use, so that the *debts* and legacies remained unpaid. It was resolved that the heir could have the land discharged, and the legatees should take their remedy against the trustees; for the estate was debtor for the *debts* and legacies, but not for the faults of the trustees, and therefore it is only liable so long as the debts, etc., should or might be paid. And where the land has borne once its burden, and the money is raised, it is discharged, and the trustees liable.

In 1718, in the case of *Carter* v. *Barnadiston,* 1 Pr. Williams' R., page 518, where one devised lands to his executors until his debts were paid, and the executor misapplied the profits, it was held that it would be very strange to say, that because one of the executors did not apply the rents as he ought to have done towards the payment of the debts, therefore, and for that reason, he that acted wrongfully should hold over. This would be directly to let a man take advantage of his own wrong, and was the same as to say, that the longer the executors misapplied the profits, the longer they should hold the estate; nay, they should hold it purely because they did the wrong.

That, therefore, this term, or uncertain interest, should determine at such time as the executors might have paid the debts, if they had duly applied the rents, etc. And as to the profits misapplied, the *creditors must pursue the trustees for such profits,* etc., citing the case in Salkeld above.

In 1800, in the case of *Omerod* v. *Hardman,* 5 Vesey Jr. R., page 734 (Sumner's ed.), Graham, Baron, referring to the case above quoted from Salkeld, says: " Mr. Hall quoted a case before the House of Lords to this effect: An estate was limited to trustees for the payment of debts and legacies. The trustees raised the money, but instead of applying it according to the trust, converted it to their own use; and it was resolved that the heir should have the land discharged, and the *legatees,* as it is expressed (but that, I take it, must mean *the creditors* as well as *the legatees*), should take their remedy against the trustees. I thought it a very strong position, but I find that Chief Baron Comyns, in his very accurate digest, has it; and when I compare it with other cases, as powers over land, or any particu-

lar charge, or an equitable mortgage, where the estate has once borne the burthen, it is discharged in the hands of the heir, and creditors are in no better condition than legatees in that respect: the *estate* having borne the burthen once for all, must not bear it again."

In the case of *Lupton* v. *Lupton*, 2 Johns. Ch. R., page 627, Chancellor Kent says: "A *legatee* who uses diligence can usually secure himself, and a colegatee ought not to suffer for his negligence, or stand security for an executor. The Court of Chancery will no doubt (and cases to this point were referred to by Ld. Thurlow in 1 Bro. R. 105), on proper application, compel an executor to bring in money acknowledged to be in his hands, or give security for a legacy payable at a future day. *There is a case in 1 Salk. 153 (which was referred to by Baron Graham, in Omerod v. Hardman, 5 Vesey, 736), and also the case of Morgan v. Morgan, in 2 Eq. Cas. Abr. 7, both of which were cases in the House of Lords, in which it was decided that if trustees waste a fund, raised out of real estate to pay the debts and legacies, or if executors waste a fund out of the personal estate, the real estate in the one case is not to be charged with a burthen which it has once borne; and in the other, it is said the* HEIR *is not to suffer for the* DEVASTAVIT *of the executor.*"

The strict adherence of our statute to the principles of the common law on this subject, is worthy of observation in the construction of the article in question. The common law made the personal estate assets, and devoted it absolutely to the payment of debts; so does our statute. The common law vested the title and possession of personal estate in the executor or administrator as a trustee or agent for the payment of debts *first;* so does our statute. The common law vests the title and possession of the real estate in the heir, immediately on the death of the ancestor, charged with specialty debts, in which the ancestor bound himself and his heirs, in the event of insufficiency of personal assets at his death. Our statute vests the title and possession of land in the heir, immediately on the death of the ancestor, charged with the payment of *all debts*, upon condition of the *insufficiency* of personal estate to pay

debts. Having thus adopted the common law substantially, in reference to the rights of heirs and creditors, it is to be taken here with its judicial interpretations; and in this view the cases just quoted are of the highest authority.

After this summary of the doctrines of the common law, from which we have mainly derived our system of jurisprudence, let us examine our own legislation with a view to ascertain what changes have been made, and to what extent the rules and principles governing the duties of executors and administrators, and the rights of the heirs and creditors at common law, have any force or application here.

Our statute of descents and distributions vests the title to real estate in the heir. Rev. Code, page 452, article 110. The 63d article, page 438, Rev. Code, prescribing the oath and bond of an administrator, bind him to administer " the goods, chattels, and credits " of the decedent, and " to pay his debts as far as his goods, chattels, and credits will extend."

Article 70, page 440, Rev. Code, confines the duties of the appraisers to the " goods, chattels, and personal estate " of the decedent.

Article 80, page 443, Rev. Code, provides as follows: " The goods, chattels, personal estate, choses in action, and money of the deceased, or which may have accrued to his estate after his death from the sale of property, real or personal or otherwise, whether he died testate or intestate, *shall be assets*, and shall stand chargeable with all the just debts and funeral expenses of the deceased, and the expenses of settling the estate; and the lands, tenements, and hereditaments of the testator or intestate shall also *stand chargeable* for the debts, *over and above what the personal estate may be sufficient to pay*, and may be subjected to the payment of debts *in the manner hereinafter directed*, saving to the widow her right of dower."

This article vests the personal estate of every character in the executor or administrator, for the payment of debts, and charges the real estate, in the hands of the heir, on the contingency that the decedent has not left sufficient personal estate to pay his debts.

That the title of the land vested in the heir, immediately on the death of the ancestor, is not only manifest from the language of article 80, above quoted, but is rendered indisputable by subsequent articles—88, 89, 90, and 91. Article 80 had fixed the rights of creditors ; the statute of descents had fixed the title of the heirs, subject to the conditional charge prescribed in article 80, and articles 88, 89, 90, 91, provided the *remedy* to charge the real estate in the hands of the heir, in the *event* of insufficiency of personal estate, as directed in article 80. Article 91, after providing for a report of the sale of the real estate, under the preceding articles, and that the Probate Court should be satisfied of its regularity, proceeds as follows : " And the court shall, moreover, order the executor or administrator to make a good and sufficient deed to the purchaser of the lands, etc., so sold, which deed shall vest in the purchaser as good and perfect an estate, in the premises therein mentioned, *as the heirs or devisees of such testator or intestate were seized of, or entitled to, at the time such order of sale was made.*"

The title of the heir is thus distinctly recognized by our statute as resting on the sufficiency of personal estate ; and so this court has held from a very early time in its history. In the case of *Smith et al.* v. *Winston et al.*, 2 How. R., page 604, it is said, " that on the death of an individual seized of an estate, it descends to his heirs, and they have not only the right of property, but the right of possession also, immediately after his death." This principle, always recognized, has been incorporated into our statute (citing Poindexter's R. Code, page 41, section 50, which will be found at page 452, article 110, Rev. Code of 1857) : " The administrator by virtue of his office, acquires no right to the real estate of his intestate." * * * " By a provision of our statute " (again citing Poindexter's Code, containing the same provisions, substantially if not literally, with articles 88, 89, 90, and 91 of our new Code, 1857), " the lands, *in case of deficiency of personal estate,* are made chargeable with the debts of the deceased ; but this is only a general liability *to take effect on condition :* and gives the administrator no power over the land. * * * * The proceeds of the sale become

assets in his hands, but the law does not give him a right to the possession in order to make the sale."

In the case of *Campbell* v. *Brown*, 6 How. R., page 234, in a very able opinion delivered by Judge Trotter, this court says: "The lands of the ancestor descend to his heirs, at his death. The *title* becomes vested in them, and can only be divested by the decree of the Probate Court, upon proceedings instituted and conducted according to the statutes of the State. The administrator, as such, had no interest in the lands, and can only take possession in the mode and for the purposes enumerated by the law. One case given by the statute, in which he may sell the real estate, is where the personal estate is *insufficient* to discharge the debts of the deceased."

The same doctrine has been constantly held by this court ever since. See *Pinson* v. *Williams*, 23 Miss. R., page 67; *Root* v. *McFerrin*, 37 Miss., page 17; *Treadwell* v. *Henderson*, decided at April Term, 1866, not yet reported.

Article 80 declares that "the personal estate" "*shall be assets*, and shall stand chargeable with all the just debts," etc., "and the land *shall stand chargeable* for the debts over and above what the personal estate *may be sufficient* to pay." The personal estate is made assets and liable at all events, without contingency. The real estate is *made chargeable*, only on condition that the personal estate is insufficient. This is the mandate of the law. It does not direct that the land shall be chargeable with debts *not paid* by the personal estate, but speaking in the place of the decedent, as at his death, it gives the land to the heir absolutely, if at that time there is a *sufficiency* of personal estate to pay the debts, whether they are ever paid or not.

In the case of *Root* v. *McFerrin*, 37 Miss. R., page 46, decided in 1859, this court has held that "on the death of the ancestor the title to his real estate vests immediately in his heirs, and can only be divested by their own voluntary deed or act, or by the judgment or decree of a court of competent jurisdiction 'by due course of law.' *The administrator, as such, has no interest in, or power over, the land belonging to his*

*intestate at his death ; nor has the Probate Court jurisdiction over it, for any purpose whatever, by the constitution, or inherently in the nature of its organization.* It is only by virtue of the special *conditional power,* conferred by legislative grant, and restricted, in its exercise, *to the happening of the particular event named in the statute,* that the Probate Court can assume to exert any jurisdiction over land which by law is vested in the heir; until the happening of the *condition or event specified in the act, no powe ror jurisdiction is permitted by the statute to be exercised by either the court, or its officers, over land.* The particular jurisdictional facts and acts prescribed by law, must first happen, in each particular case, and be judicially ascertained of record, before the power of the Probate Court, to order the sale of land, attaches.   \*   \*   \*   \*   If the judicial investigation should prove that the personal estate is *insufficient* for the payment of debts, and the persons interested and notified to attend show no good cause to the contrary, then for the first time has attached this special, limited jurisdiction, to order the sale of the land belonging to the heirs of the estate thus reported insolvent.   \*   \*   \*

"After the fact of jurisdiction is established in the record, both over the subject-matter and the person, then all the presumptions arise in favor of these judgments, in these courts of special and limited jurisdiction, which inherently belong, and are applied, to courts of original, general jurisdiction.   In the one case the court's power and jurisdiction is self-existing, inherent, always ready to be exercised over that subject, without a precedent investigation, to ascertain facts upon which to found its action.   It is hence called ' original,' beginning with its constitution, and not attaching after the happening of some event or fact which calls its power into being.   It is called 'general ' because it applies to all subjects embraced within the object of its original organization, and to all parties who can be reached by its process and bound by its power.   But in the other case (a court of special limited jurisdiction), its powers are dependent, inferior, derivative—not inherent, superior, and original.   Until the facts, upon which its authority depends,

44

are shown to exist, it has no vitality. As soon as it performs the particular duty enjoined upon it, the power ceases. We must be careful to separate in our minds the general powers of the Probate Court as organized under the constitution from those of the Probate Court exercising a special authority not derived from the constitution, but delegated by the legislature, over a particular subject, and under certain particular circumstances."

The uniform doctrine of this court has been, that on the death of the ancestor the title of the land vests in the heir, which can only be divested or defeated by the happening of the contingency specified in our statute, to wit: the *insufficiency* of the personal estate to pay the debts.

The will of the legislative power being substituted for the will of the decedent, in the absence of any express provision to the contrary, must be regarded as speaking or taking effect at the death of the decedent. The law existing at the death of the decedent operates an immediate disposition of the title to his estate, for the purpose of preserving the estate and making a just distribution between his creditors and heirs. As the personal estate is the primary and natural fund to satisfy the demands of creditors, we have seen that, both by the common law and by our statutes, this is set apart and vested in the administrator as their common agent, and as their share, *if sufficient* to satisfy *their* demands. As the real estate is of a more permanent and imperishable character, usually embracing the home of the ancestor, as well as of his family, both the common law and our statute law, in sympathy with *their* natural wishes and wants, have vested the title to this real estate, immediately on the death of the ancestor, in his heirs—his widow and children—under certain modifications. Under article 80 of the Code just quoted, the widow takes *her* share, or dower, in the real estate, *absolutely discharged* of the debts of creditors, whether the personal estate is *sufficient*, at the death of the decedent, to pay his debts or not. The question now here is, whether this article, *charging* the real estate in the hands of the heir, in the event of an *insufficiency* of personal estate, with

the payment of debts, refers to an *insufficiency* existing at the death of the decedent, when *the law* has taken charge of his estate and undertaken its disposition; or whether it refers to *insufficiency* in all future time, occasioned by the act of God, the public enemies, or the waste, misapplication, or destruction of the property by the common agent—the administrator.

Looking to the *language* of the act as the best interpreter of the legislative intention, it declares first, that "the goods," etc., of the deceased "*shall be assets,*" and shall stand chargeable with all the just debts. When? Can it be questioned that by this language the legislature meant that *at the death of the decedent* his personal estate should be assets, and stand chargeable with his debts? If not, at what subsequent time shall it become assets and stand so chargeable? If there could be any question on this point, the next article (81) of the Code would seem to settle it. It makes it the duty of every executor or administrator "to proceed to pay the debts *as speedily as may be, out of the assets,*" etc.

If, then, this language, as to the personal estate, is to be read as referring to the death of the decedent, how can the remaining member of the same sentence, "and the lands, etc., shall also stand chargeable for the debts over and above what the personal estate may be *sufficient* to pay," be referred to a different date or event nowhere fixed by the act? *Sufficiency at the death of the ancestor,* when the law took his place and undertook a just disposition of his property among those entitled to its appropriation, seems to be not only the intention of the legislature, from a fair construction of the language of the act, but most consistent with the design and object of such legislation. When, at the death of the decedent, the law, as the friend of the creditor, as well as the heir, assumes to dispose of the estate, divides and separates it, giving to the creditors their share, ample to pay their debts, placing it in the hands of their agent and trustee, and giving to the heir the title and possession of the real estate, upon what principle of right or justice is it that we are told that because by act of God, or the public enemy, or the conduct of an unworthy or unwise agent, or by any other casualty, the creditors' share of the property in his

hands under the management of his agent and trustee is lost or destroyed, he must have another division? Is the heir, after the law has thus divided the estate, giving to the creditor priority of right and exclusive possession of the whole personal estate, to be regarded and treated as an *insurer* of the creditor's portion?

Is the adult creditor, who is generally able to take care of his own interests, to be preferred to the infant heir, so far as to enable him to throw *his misfortunes* upon the innocent heir? If in his lifetime the ancestor, having a *sufficiency* of property to pay all his debts, had done the same thing, viz., had conveyed to his children, as a gift, a considerable portion of his estate, leaving at the time ample property to satisfy the demands of creditors, and next week or day, by the act of God, or the public enemy, or even the act of the ancestor himself, *without any fraud* or intentional destruction, the whole of his remaining estate had been swept away, who will assert at this day that the creditor will be permitted to disturb the title of the child? Courts of law and equity of the highest authority have upheld and supported the title of the child under such circumstances; and yet the case against the creditor, when *the law* has given *him* all the personal estate, must be regarded as infinitely stronger.

Again, it is not the policy of the law to tie up estates, or fetter inheritances. The effect of such a construction of the act in question, as would make the lands of the heir chargeable in his hands for an insufficiency of personal estate occurring in the whole course of administration, or at any other time than the death of the ancestor, would not only be to charge him for the misconduct of the mutual agent, over whom he had no more control than the creditor had, as well as for all casualties operating a destruction of the personal estate, but even in case of a continuing sufficiency of personal assets, would be to deny to him the right of enjoyment of the inheritance cast upon him to an indefinite period. He could neither sell nor improve the estate, until the administration was finally wound up, in the tardy process of probate jurisdiction; and in the

present unhappy condition of the State, where dwellings and improvements of every character have been laid waste, such a rule of construction would be as unjust as disastrous.

It is insisted that the policy in England, inaugurated by the act of William IV., to make *the whole* of a man's property at his death liable to his debts, is consonant with the principles of honesty and justice; and that the legislation of this State is in "entire accordance" with that policy, prevailing in England as well as the United States.

I do not agree with the majority of the court in either proposition.

I do not agree, in the first place, that it is wise or just as a question of *legislative policy* to provide by law that creditors may appropriate to themselves "*the whole*" of a decedent's estate, leaving to penury or private charity the victims of his improvidence. It is not wise because it induces the heartless to trust the improvident, *with a view to the acquirement of his whole* estate; and the destitution thus produced fills the State with pauperism, ignorance, despair, and crime. It is not just, because it denies to the wife and children even food and raiment out of estates often acquired by their common effort; and because the heir is not only entitled to parental but governmental care and protection also.

It is not good policy to *provide by law* that whole families shall be stripped of the last remnant of property, the means of support, of education, of virtuous and honorable incentive, for the benefit of those who think proper to risk their property on such a venture.

It is a much more wise, just, and humane policy for the State in the beginning to make provision for the family by the most liberal exempt laws. No creditor is injured who knows, when he trusts a debtor, that the law will not allow him to appropriate *the whole* of a debtor's estate. No creditor is injured when the law has continually spoken to him for over forty years, saying, that in case your debtor dies, leaving *sufficient personal estate* to pay his debts, you shall not have his land, but it shall go to his heirs. And in my opinion this is what the statute in question, passed

in 1821, did.   Creditors cannot now complain of hardship.    On the contrary, to take the real estate from the heirs, in the face of this declaration, and give it to creditors by judicial interpretation, in my judgment would be the most cruel injustice to this most defenseless class.

Nor do I agree in the proposition " that the legislation of *this State* is in entire accordance with the rules and policy now established in England, and prevailing generally in the United States ; " if indeed such is there the rule of policy.

In the first place, it is evident that in *this* State we have not copied the rule or policy of disinheriting the heir in favor of creditors, from the English law, even if our statutes were capable of such a construction.   For our policy on this subject, so far as the act in question is concerned, was adopted in 1821 ; while the wisdom, justice, and honesty of giving *all a man's property* to creditors, at the expense of hungry children, never occurred to the British Parliament until 1833.   And in the second place, our act was a modification of the common law of England, which existed in its full force here at that time, giving to the heir the real estate of the ancestor, to the exclusion of all creditors, except those by specialty charged on the *obligor and his heirs.*

This was the common-law *rule and policy* in force at the date of our act, and *the policy* in reference to which our legislation must therefore be construed.

But again : in the legislation of this State I am unable to perceive the least evidence of a policy " to subject all a man's property to the payment of his debts," so often reiterated.

Very early in our history we abolished imprisonment for debt ; one of the means of " subjecting all a man's property to the payment of his debts."   And without stopping to trace the growth and history of this policy of unfettering the debtor, and of relieving his family from want, it will be sufficient to say that to-day, as the result of that policy, *a comfortable independence* is secured to the *debtor*, as well as to his family, free from the debts of creditors, instead of subject to their demands under the policy imputed ; and this without injury to credi- .

tors. For, when they trust the debtor, they know in the eye of the law, as well as justice, *this property* is not to excite their cupidity, but is a beneficent provision of the State to protect her children from poverty, ignorance, and menial servitude. The State serves every creditor with notice of her intention, and warns them to trust the debtor at their own peril, instead of at the peril of the helpless.

So that, whether we look to the intention of the law in the light of its letter, or view it in reference to the policy, justice, or propriety of such a law, as indicative of its intention, it seems equally clear that the title of the heir to the real estate, when there is a *sufficiency* of personal estate at the death of the ancestor, is not only disencumbered, but is as perfect in justice and in conscience as the right of the creditor to the personal estate.

It is said, however, that Chancellor Kent says, in the fourth volume of his Commentaries, page 421, " that the rule prevails generally in the United States, that the lands, descended to the heirs, are liable *equally in all cases* with personal estate." This is an extract from his original text, to which should be added : " In Massachusetts, the personal estate is first to be applied, and the land resorted to upon *a deficiency* of personal assets." With this further addition of his note (*c*) to the above quotation : " It has been stated that the common law rule prevails still in Virginia, and perhaps in Kentucky; but *everywhere else* in the United States, the equitable rule seems to have been adopted, that on *failure of personal assets*, the real estate in the hands of heirs and devisees is liable for debts, as extensively as the personal. *The common law rule has been altered by statute.*" And so Chancellor Kent is quoted both by Williams on Exrs., volume 2, page 1526, note 2 ; and by Jarman on Wills, volume 2, page 546. This is a great modification of the statement in the text, that generally in the United States, lands " are liable *equally in all cases with personal estate,*" and comes very far short of an authoritative construction of the act of Mississippi, of the existence of which he seems to have had no knowledge.

We have, however, an *opinion* of this learned author, as Chancellor of the State of New York, which is strongly corroborative of the view I entertain of the true construction of our statute under consideration.

In the case of *Moores* v. *White*, 6 Johns. Ch. R., page 360, the question arose upon the construction of the act of New York, in relation to subjecting the real estate in the hands of the heir, on account of a deficiency of personal assets, under a statute substantially like ours.

After reciting the provisions of the act, the Chancellor says he infers from them, that the law intended that the executor or administrator should make his application with due diligence, and in a *reasonable time;* and if he does not, the judge or surrogate has, from the nature of his judicial trust, a discretion to reject the application.  *  *  He further says, that the "judge of probates must be entitled to determine, in sound discretion, what is a reasonable time, under the circumstances of the case, and to determine when the executor did first discover, or had ground to suspect, the insufficiency of the personal estate; and whether, *as soon as conveniently might have been,* he had made out an account and filed an inventory, and applied the assets on hand according to the requisitions of the statute.  If he has been guilty of gross negligence, or palpable laches on these points, he is clearly not in season within the meaning of the act, and the judge ought not to permit him, or the creditor who prompts him, by this summary proceeding, to sweep away the real estate of the heir."

And after citing the statutes of New York requiring the executor to file the inventory *in six months* (as is required by our law), and also the act allowing one year before he is liable to be called on to pay legacies or make distribution, he says: "The legatee and the next of kin are then entitled to sue; and perhaps it would not be going too far to say, that under the sound construction of the statute, and the pressing diligence which it requires, the executor or administrator ought to be ready to apply, and ought to make his application within one year after he entered upon his trust; and that every subse-

quent application, unless under peculiar circumstances and with some reasonable cause for delay, may consistently with sound discretion, and the spirit and policy of the act, be adjudged out of season and rejected."

This case clearly demonstrates that, under legislation like ours, real estate descended to the heir is not "liable *equally in all cases* with personal estate." And it further establishes the position that real estate in the hands of the heir is not chargeable at *any time,* upon the application of the administrator, during the whole period of administration.

Let us now examine this question in reference to the adjudications of this court, to see how far it may be regarded as settled by direct decision.

The first case in which the title of the heir is considered, in reference to the sufficiency or insufficiency of the personal estate, is the case of *Turner* v. *Ellis,* 24· Miss. R., page 173. After stating the facts of the case, Judge Fisher, delivering the opinion of the whole court, says: "The question to be decided is, whether the heir-at-law, when an administrator shall petition the Probate Court to sell the lands of the intestate to pay debts, can show that the *insufficiency of the personal estate,* for that purpose, resulted from a· neglect of · duty or waste of the assets by the administrator."

This decision then states the substance of the statute authorizing a sale of real estate in case of deficiency of personal estate. It next proceeds to discuss it as follows :

" The statute in effect prescribes the issue to be tried. It is whether the personal estate is insufficient to pay the debts of the estate, and the parties to this issue are the administrator who avers the insufficiency of the personal estate, and those interested in the lands sought to be charged, who aver the affirmative of the proposition, or sufficiency of the personal estate.

" The court is to hear the allegations and proofs,    *    *    * and to decide the case according to the weight of evidence introduced before it.

" The appellant proposed to prove in effect that the estate *had become insolvent through the neglect or omission of duty upon*

*the part of the administrator.*  This proof was certainly relevant to the issue.  \*  \*  \*  The proof was, that there were certain slaves, known to the administrator, in the possession of another person, and part of the estate.  This proof was relevant to the issue.  \*  \*  \*  \*  We have no hesitation in deciding the law to be that, if the personal estate become insufficient to pay debts, in consequence of a devastavit or neglect of duty by the administrator, the heir-at-law can insist on this *as a defense* against the sale of the lands descended.  In such case the creditors' remedy would be by an action on the bond of the administrator ; and the judgment of the Probate Court in refusing a sale of the land would be equivalent to deciding that the personal estate was sufficient to pay the debts of the intestate, and had been wasted by the administrator.

" The last point as to the *effect* of the judgment of the Probate Court is not necessarily involved, and we therefore express no binding opinion on the subject."

The point decided in this case was, " that, if the personal estate became insufficient to pay debts, in consequence of the devastavit or neglect of duty by the administrator, the heir-at-law can insist on this as a defense against the sale of the lands descended," and the court unanimously declare that they had no hesitation in deciding this to be the law.

The case clearly establishes that insufficiency of assets, *at the time of application or order of sale,* in the Probate Court, is not the question ; but that the heir may show a *prior sufficiency,* and waste or loss of assets by the fault of the administrator ; or even the existence of assets prior to the grant of administration in the hands of a collector of the estate ; or that slaves belonging to the estate in a distant county, might have been reached by the administrator since his appointment.  Or, in the language of this court, that *at* the time the appellee administered on the estate, and for a considerable time thereafter, there was other personal property of the intestate, which the administrator, with ordinary diligence, might have reduced to possession, and did not ; and the existence of these facts, all long prior to the trial of the issue in the Probate Court, of the sufficiency of assets *vel*

*non,* constitutes a defense for the heir against the sale of the lands descended.

In principle, the case of *Turner* v. *Ellis* seems to me to be conclusive of the case before us. This case was decided at the April Term, 1852.

The next case in order is the case of *Lee* v. *Gardner,* 26 Miss. R., page 521. This was an action of debt, by a creditor against an administratrix, suggesting a devastavit. So far as concerns the point before us, the case was this : The declaration averred that the administratrix had of the goods, chattels, credits, and sums of money, which were of the estate of the deceased *at the time of his death,* in her hands to be administered, to the amount of the plaintiff's judgment, of which she distributed the the sum of $13,395 to the heirs, and thereby committed the devastavit complained of.

The fourth plea of defendant (the administratrix) alleged, that no money or credit, which were of the deceased *at the time of his death,* came to her hands ; and that all the goods and chattels of the deceased, *at the time of his death,* which came to her hands, were duly sold by order of the Probate Court, and the proceeds duly paid to the creditors of the deceased, and that no part thereof was wasted or misapplied.

To this plea the plaintiff replied, that the administratrix represented to the Probate Court the insufficiency of the personal estate to pay the debts, and obtained an order to sell the real estate, which she sold for $20,092.50, and received the money, but did not apply it to the payment of the debts of the estate.

To this replication the defendant demurred generally, and the demurrer was overruled in the court below.

The present Chief-Justice, delivering the opinion of the court, after stating the points made in support of the demurrer, thus states the question before the court in that case :

" The main point involved in both these objections (to the replication) is, whether the real estate of a deceased person, administered by the Probate Court or under its jurisdiction for the payment of the debts of the deceased, in case of insuf-

ficiency of the personal estate properly shown, is assets, subject to such administration, *as of the time of the death of the intestate;* and whether the administratrix is responsible to creditors for the proceeds, as for assets of the deceased *at the time of his death.*"

The judgment of the court below on this point, overruling the demurrer to the replication, was affirmed upon the ground " that lands are subject to administration for the payment of debts, as of the assets of the deceased *at the time of his death;* that it is the duty of the administrator, in case of deficiency of the personalty, to sell them for that purpose, under the order of the Probate Court, which he is required to obtain, and when sold, that he is responsible for the proceeds as assets of the deceased *at the time of his death.*"

This case proceeds upon the hypothesis that the "insufficiency of the personal estate was properly shown," and the order of sale, and actual sale and receipt of the money by the administratrix, were all also shown. The only matter of controversy was whether the money in her hands was to be regarded as assets in her hands *at the death of decedent.* If so, then the *replication* was not a departure from the declaration, which averred a *devastavit* of *goods, chattels, credits and moneys* which were of the deceased *at the time of his death.*

On the other hand, if the proceeds of the sale of the real estate, by order of the Probate Court, in the hands of the administratrix, were not to be regarded as goods, chattels, credits, or moneys of the deceased *at the time of his death,* the replication would have been a departure, and the demurrer would have been sustained.

It is manifest that there is nothing in this case which can be regarded as in conflict with the case of *Turner* v. *Ellis.* On the contrary, the case is decisive of the point, that even the proceeds of the sale of land, made in the course of administration upon the ground of the insufficiency of the personal estate to pay the debts, when it comes to the hands of the administratrix, is to be regarded as assets of the decedent at *the time of his death.* And if assets, as at the death, it must result that it is so

Evans *v.* Fisher.

because of deficiency of personal assets at the same period ; for the real estate can never become chargeable as assets *before* there is a deficiency of personal estate ; and this view is decisive of the question as to *what time* the sufficiency or insufficiency of the personal estate must be shown to exist, in order to divest the title of the heir.

The last case decided in this court on this subject is the case of *Paine* v. *Pendleton*, 32 Miss. R., page 320. The opinion of the court was delivered by the present chief-justice.

This was an application to the Probate Court for an order to sell the real estate of decedent, on the ground of the insufficiency of the personal estate, and upon notice to the heirs and all others interested in the lands. The petition was taken as confessed, as to the heirs ; other parties answered, denying the insufficiency charged, relying on the statute of limitations, and some of them claiming title as purchasers. The administratrix demurred to their answers; the demurrer was overruled ; and, on the hearing, the petition was dismissed.

Two points were insisted on for error in this court : first, that the respondents were not proper parties ; and second, that the *pro confesso* by the heirs was an admission of the facts stated in the petition, and of the necessity for the sale prayed for, and it was therefore error in the Probate Court to dismiss the petition.

The opinion of the court, after holding that third persons interested in the lands were proper parties, and that their rights could not be affected by the *pro confesso* against the heirs, or even by their express consent that the decree prayed for should be made, proceeds to determine that, " although the allegations of the petition be taken as confessed, yet if it appeared to the court, upon an examination of the proceedings in relation to the administration, that the personal estate had not been exhausted, or legally disposed of by the prior administrator, it was proper for the court to refuse the decree of sale. Upon the suggestion of parties showing a *primâ facie* interest in the lands, it ·was the duty of the court to examine the proceedings as they appeared of record touching the administration. They constituted a necessary part of the case to be considered by the

court, in determining whether the sale of the lands should be decreed.

"It appears by the record," says the court, "that on the hearing of the petition, there were assets largely exceeding the amount of the claim against the estate, on which the petition was founded, which had never been administered or accounted for by the prior administrator. If those assets were wasted by the prior administrator, that would be no ground for selling the lands of the decedent for the payment of his debts, unless the creditors had exhausted all remedy, in due and legal form, against the administrator and his sureties. The remedy of the creditors would be against that administrator; and if he and his sureties on his bond were insolvent, as was attempted to be shown here, that would not of itself justify a sale of the lands, for the personal assets were sufficient to pay the debts; and if the Probate Court failed to require sufficient sureties to the administrator's bond, and in consequence thereof, the assets of the estate, which were sufficient to pay its debts, were collected and wasted by that administrator, there could be no reason or justice in charging the debts of the estate upon lands to which the heirs were entitled, or in which other persons as purchasers had become interested; *all legal remedies against the administrator and his sureties not being shown to have been exhausted.*"

This case, so far as it goes, is not inconsistent with the case of *Turner* v. *Ellis*, or the subsequent case of *Lee* v. *Gardner.* But with the utmost deference, it seems to me that the forcible argument in behalf of the rights of the heir contained in this opinion, ought to have led the court to a more vigorous conclusion.

When it is remembered that the law has made this distribution of the decedent's property, between his creditors and heirs; that the administrator is the agent and trustee of the creditor, and that the heir is bound to no duty, and charged with no diligence by the law, in the administration or preservation of the personal estate for the benefit of the creditor, but takes the realty upon the single condition of the insufficiency of the personal estate to pay the debts, the *reasoning of the court* would seem imperatively to exclude the idea that

the heir should be held responsible to the creditor for the waste, mismanagement, and even insolvency of the creditor's agent and trustee, and his sureties on the administration bond. I know of no law or principle " of reason or·justice," by which the heir is held bound to creditors as the security of an insolvent administrator and his securities, " *after all legal remedies against them by the creditor have been exhausted.*"

The court says: " The remedy of the creditor would be against the administrator, and if he and his sureties on the administration bond were insolvent, *that would not of itself justify a sale of the lands.* For the personal assets *were* sufficient to pay the debts; and if the Probate Court failed to require a sufficient bond, and the administrator wasted the assets, there could be no reason or justice in charging the lands to which the heir was entitled."

If the insolvency of the administrator and his sureties would not justify a sale of the land, and neither reason nor justice would sanction their sale, I am at a loss to conceive how the exhausting of all legal remedies against the administrator and his securities, or obtaining a judgment and return of *nulla bona,* could render the creditor's claim against the heirs any more reasonable or just; for this would but establish the insolvency of the administrator and his securities, which the court says would not justify a sale of the land.

I take it, therefore, that this decision must be regarded as settling the points, that the devastavit by the administrator, of assets originally sufficient to pay the debts, discharges the lands in the hands of the heir; and that the creditor's remedy is against the administrator.

The extent of real property that must pass or be transmitted by descent or devise is immense; and the number of persons. who, through mesne conveyances or otherwise, must become interested in that property, is almost inconceivable. The magnitude of the interests involved, the general dependence of the class of persons to be affected, and the dilapidated and ruined condition of the real estate of the country, rendering improvements of a costly and permanent character *necessary* to its

enjoyment, all conspire to render this construction of our statute one of momentous and fearful importance.

Public policy certainly requires that a statutory power of such formidable import, and affecting such a variety and amount of interests, in derogation of the common law, fettering inheritances, and seriously affecting the interests of infant heirs, should be strictly construed. *Moores* v. *White*, 6 Johns. Ch. R., page 377; 1 How. Miss. R., page 62. Such a construction of the act in question, I should regard as most beneficial to the public; since it conduces to the quiet and security of titles, to the support, maintenance, and education of infant heirs, without injustice to creditors, and to the protection of *bonâ fide* purchasers from the heir or devisee.

For these reasons I have felt impelled to dissent from the opinion of the majority of the court.